UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GARY PUHR, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 728 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| PQ CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Gary Puhr brought this negligence suit against PQ Corporation in the Circuit Court of Will County, Illinois, alleging injuries from a chemical spill on PQ's premises. Doc. 1-1. PQ removed the suit under the diversity jurisdiction. Doc. 1. After the parties engaged in discovery, PQ moved for summary judgment. Doc. 34. The motion is granted.

**Background**

The following facts are stated as favorably to Puhr as permitted by the record and Local Rule 56.1. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering PQ's motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

On December 31, 2013, while working as a driver for Univar USA, Puhr attempted to deliver sodium hydroxide—a caustic chemical that can cause severe skin burns—to a PQ facility in Joliet, Illinois. Doc. 34-1 at ¶¶ 1, 5, 17, 29; Doc. 39 at ¶¶ 1, 5, 17, 29. After arriving at the facility, Puhr called the PQ office to gain entry and proceeded through the gate. Doc. 34-1 at ¶¶ 23, 30; Doc. 39 at ¶¶ 23, 30; Doc. 39-1 at ¶ 22. Puhr backed his truck into the area designated for unloading caustic substances, which sloped downward. Doc. 34-1 at ¶ 29; Doc. 39 at ¶ 29.

1

Because he noticed "snow and so forth" at the bottom of the slope, Puhr parked the truck higher up the slope than he ordinarily did. Doc. 34-1 at ¶ 29; Doc. 39 at ¶ 29; Doc. 39-1 at ¶¶ 29-30.

Puhr donned his Univar-provided personal protective equipment ("PPE"), which did not include protective rubber boots. Doc. 34-1 at ¶¶ 23, 30; Doc. 39 at ¶¶ 23, 30; Doc. 39-1 at ¶ 35; Doc. 40-2. After a PQ employee reviewed his paperwork and tested a sample of the sodium hydroxide, Puhr connected his truck to PQ's intake valve with a hose. Doc. 34-1 at ¶¶ 23, 30; Doc. 39 at ¶¶ 23, 30; Doc. 39-1 at ¶¶ 23-25. Having observed that the air necessary to push the sodium hydroxide through the line was not flowing, Puhr restarted the air compressor on his truck, opened and closed several valves, and, with area temperatures ranging from ten degrees Fahrenheit to as low as negative one, attempted to heat the line with a handheld propane torch. Doc. 34-1 at ¶¶ 28, 30-31; Doc. 39 at ¶¶ 28, 30-31. Puhr's efforts to heat the line resulted in a slight crack to one of the valves, causing a small amount of sodium hydroxide to leak out. Doc. 34-1 at ¶ 32; Doc. 39 at ¶ 32. Puhr ultimately determined that he could not troubleshoot the air-flow problem himself, and called Univar's dispatcher for help. Doc. 34-1 at ¶ 34; Doc. 39 at ¶ 34. The dispatcher advised Puhr to return to Univar without completing the delivery. Doc. 34-1 at ¶ 36; Doc. 39 at ¶ 36.

At some point during his troubleshooting the line, while near the back of the truck, Puhr noticed that he was standing in several inches of liquid or "slush." Doc. 39-1 at ¶ 31. By the time Puhr called the Univar dispatcher, he felt burning in his left foot. Doc. 34-1 at ¶ 35; Doc. 39 at ¶ 35. The sensation worsened as Puhr disconnected and stored his equipment. Doc. 34-1 at ¶ 37; Doc. 39 at ¶ 37. Puhr ultimately suffered chemical burns on the tops of his feet attributable to walking through caustic liquid without protective rubber boots. Doc. 34-1 at ¶ 40; Doc. 39 at ¶ 40; Doc. 39-1 at ¶¶ 35-36; Doc. 40-2.

**Discussion**

The parties agree that Illinois law governs this suit. *See Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1038 (7th Cir. 2016). Under Illinois law, a "plaintiff … who alleges that the defendant was negligent must show a duty owed by the defendant, a breach of that duty, and injury that was proximately caused by the breach." *Ibid*. As Puhr acknowledged at the summary judgment hearing, Doc. 51, his sole theory of liability is that PQ owed him a duty of reasonable care as an invitee onto its premises, and that it breached that duty by failing to discover and clean up the spilled caustic liquid that caused his burns. Doc. 37 at 1-3. Puhr accordingly has forfeited any other theory of negligence, including that PQ breached a duty due to any retention of control of his work. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Nextel specifically requested summary judgment on the quantum meruit claim. Keck Garrett, however, did not defend that claim in its reply to Nextel's motion for summary judgment. By failing to present its argument to the district court, Keck Garrett abandoned its claim."); *Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [an argument] in his brief opposing summary judgment, [the plaintiff] lost the opportunity to urge it in both the district court and this court."), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

Under Illinois law, PQ, as a property owner, owed invitees like Puhr "a duty to maintain the premises in a reasonably safe condition." *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017); *see also Newsom-Bogan v. Wendy's Old Fashioned Hamburgers of N.Y., Inc.*, 953 N.E.2d 427, 431 (Ill. App. 2011) (same). "When a business's invitee is injured by … a

foreign substance, the business can be liable if the invitee establishes that: (1) the substance was placed there by the negligence of the business; (2) the business had actual notice of the substance; or (3) the business had constructive notice of the substance." *Piotrowski*, 842 F.3d at 1038. Because the record evidence would not permit a reasonable juror to find PQ liable under any of these three theories, PQ is entitled to summary judgment.

## I. PQ Did Not Create the Dangerous Condition.

As to the first theory of liability, "[t]o prove that the defendant business, as opposed to a third person, created the dangerous condition," the plaintiff must "(1) show that the foreign substance was related to the defendant's business and (2) 'offer[] some further evidence … from which it could be inferred that it was more likely that defendant or his servants, rather than a customer, dropped the substance on the premises … .'" *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649-50 (7th Cir. 2014) (quoting *Donoho v. O'Connell's, Inc.*, 148 N.E.2d 434, 439 (Ill. 1958)). Puhr's attempt to establish liability under this theory founders on the second requirement, as the summary judgment record would not permit a reasonable juror to find that it was more likely than not that PQ—as opposed to, say, either Puhr himself or a recent delivery from a non-party—created the accumulation of caustic liquid that injured him.

Puhr contends that Tom Skala—the PQ employee who, on the day in question, was responsible for processing Puhr's paperwork, testing the sodium hydroxide sample, and unlocking PQ's intake valve, Doc. 39-1 at ¶ 25—"was never actually informed … of PQ company policy to remove all standing water and material in the unloading area." Doc. 37 at 11. Consequently, Puhr contends that Skala's "*omissions* are what created and allowed the dangerous conditions to exist that Puhr was exposed to." *Id*. at 12. (emphasis added). But the fact that a PQ employee failed to clean up the spill in violation of PQ's policies does not make it

4

more probable than not that a PQ employee was responsible for causing the spill in the first place. *See Piotrowski*, 842 F.3d at 1039 (holding that because the plaintiff did not "see the rocks [that injured her] fall, and neither she nor anyone else to whom she points knew how the rocks at issue ended up where they did," she could only speculate that an employee of the defendant "could have caused the rocks to spill"); *Zuppardi*, 770 F.3d at 650 ("Zuppardi does not come close to setting forth sufficient evidence, either direct or circumstantial, to create an inference that Wal-Mart caused the spill. She did not see the water prior to the fall nor did she know how the water accumulated."); *Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988) (noting that summary judgment is appropriate where "[t]here was no evidence that the defendants *placed* the substance on their property") (emphasis added).

## II. PQ Did Not Have Actual Notice of the Dangerous Condition.

For similar reasons, the summary judgment record would not allow a reasonable juror to find that PQ had actual notice of the spill. Puhr contends that Skala was "physically inside the unloading area" on the day in question. Doc. 37 at 8. But Puhr does not point to any evidence in the record that Skala actually knew about the spill. Rather, Puhr contends only that "*it can reasonably be inferred* the 'snow and so forth'" he described "was equally visible to Skala considering [Skala] entered the unloading area near the back of Puhr's truck to unlock the valve." *Ibid*. (emphasis added). This at most amounts to an argument that Skala should have known of the potential risk posed by an accumulation of caustic liquid in the unloading area, not that he had actual knowledge of the accumulation. *See Adams v. N. Ill. Gas Co.*, 809 N.E.2d 1248, 1260 (Ill. 2004) (defining constructive notice as facts that "would have made the [relevant hazard] known to an ordinary prudent person"). Contrast the situation in *Pavlik v. Wal-Mart Stores, Inc.*, 753 N.E.2d 1007, 1010 (Ill. App. 2001), where the summary judgment record

5

contained testimony that a store "employee remarked 'oh, she was supposed to clean [the spill] up and she didn't,'" thus demonstrating that store employees had actual acknowledge of the spill that injured the plaintiff.  *See also Darmo v. Target Corp.*, 2016 WL 1161282, at *4-5 (N.D. Ill. Mar. 23, 2016) (holding that the existence of a security camera on the premises was insufficient to create a triable issue as to actual notice where "there [was] no evidence, disputed or otherwise, that any Target security officer saw the spilled water or otherwise knew that a spill had occurred"), *motion for reconsideration granted on other grounds*, 2016 WL 5871486 (N.D. Ill. Oct. 7, 2016); *Carlson v. Wal-Mart Stores, Inc.*, 2007 WL 4569867, at *5 (N.D. Ill. Dec. 21, 2007) (granting summary judgment as to actual knowledge where there was no evidence that the defendant's employee "knew about [the relevant] area of slipperiness prior to plaintiff[']s fall"); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 971 (N.D. Ill. 2007) ("Since Plaintiff has not provided any evidence that any store employees were aware of the substance she slipped on, she has not demonstrated actual notice."); *Erkol v. Marshall Field & Co.*, 1989 WL 18248, at *2 (N.D. Ill. Mar. 1, 1989) (same).

  The same holds for Puhr's contention that PQ had actual notice of the chemical spill because "Skala was the PQ employee charged with enforcing PQ's company policy to clean the area before any unloading took place and to check for PQ[-]required PPE."  Doc. 37 at 8.  Skala's responsibility for cleaning the unloading area may have put him on *constructive* notice of the possibility of a hazardous accumulation of caustic liquid, but, in the absence of evidence indicating that Skala, in fact, was aware of the risk, it is insufficient to establish a genuine issue of material fact as to *actual* notice.  *See Darmo*, 2016 WL 1161282, at *4-5; *Carlson*, 2007 WL 4569867, at *5; *Byrd-Tolson*, 500 F. Supp. 2d at 971; *Erkol*, 1989 WL 18248, at *2.

**III.     PQ Did Not Have Constructive Notice of the Dangerous Condition.**

That leaves the question of whether the summary judgment record would allow a reasonable juror to find that PQ had constructive notice of the spill. According to Seventh Circuit precedent, "[c]onstructive notice can be established in Illinois [1] by presenting evidence that the dangerous condition was present for a sufficient length of time such that in the exercise of ordinary care its presence should have been discovered, or [2] by showing that the dangerous condition was part of a pattern of conduct or a recurring incident." *Piotrowski*, 842 F.3d at 1040; *see also Zuppardi*, 770 F.3d at 651 (same); *Culli*, 862 F.2d at 123 (same, citing Illinois cases).

As for the first method of proving constructive notice, there is no evidence that would permit a reasonable juror to determine how long the particular dangerous condition that injured Puhr existed before the injury. Puhr points to testimony from Skala suggesting that the unloading area "sometimes … would be left with water in it for days" and that leaks of sodium hydroxide "would contaminate the unloading area because 'there was a leak there sometimes.'" Doc. 37 at 10. But this testimony sheds no light on the timing of the *particular* spill that injured Puhr, which is the critically important fact under Illinois law. *See Zuppardi*, 770 F.3d at 651 ("Absent any evidence demonstrating the length of time that the substance was on the floor, a plaintiff cannot establish constructive notice.") (citations omitted); *Torrez v. TGI Friday's, Inc.*, 509 F.3d 808, 811 (7th Cir. 2007) (when constructive notice is alleged, "[o]f critical importance is whether the 'substance [that caused the accident] was there a length of time so that in the exercise of ordinary care its presence should have been discovered'") (alteration in original) (quoting *Tomczak v. Planetsphere, Inc.*, 735 N.E.2d 662, 667 (Ill. App. 2000)). Here, even if the caustic liquid accumulated in the unloading area prior to Puhr's arrival, the summary judgment record does not reveal *when* it did so, and that lack of evidence is fatal to Puhr's attempt to

7

establish constructive notice under the first method. *See Zuppardi*, 770 F.3d at 651 ("Zuppardi fails to meet her burden of demonstrating Wal-Mart's constructive notice of the puddle because she presents next to no evidence of how much time elapsed between the spill and the fall. … We are therefore unable to say with any certainty how long the puddle may have been present before detection."); *Reid v. Kohl's Dep't Stores, Inc.*, 545 F.3d 479, 482 (7th Cir. 2008) (concluding that, because the record did not "indicate with any degree of certainty how long the milkshake had been on the floor," the plaintiff's "cursory conclusion that the milkshake must have been on the ground 'for some time' falls flat"); *Culli*, 862 F.2d at 125 ("[B]ecause of the lack of testimony establishing how long the substance was present, we do not know if the substance was present at the gas station for a period of time which would have placed the defendants on constructive notice of a dangerous condition."); *Hayes v. Bailey*, 400 N.E.2d 544, 546-47 (Ill. App. 1980) ("[T]here is no evidence at all as to how long the water had been on the floor of the restroom. … In the absence of any evidence tending to show constructive notice we believe it was proper to not submit the case to the jury … .").

As for the second means of proving constructive notice, the summary judgment record provides no evidence from which a reasonable juror could conclude that that the dangerous condition resulting in Puhr's injury was consistent with "a pattern of dangerous conditions or a recurring incident which was not attended to within a reasonable period of time." *Piotrowski*, 842 F.3d at 1040; *see also Culli*, 862 F.2d at 126 (noting that "[w]hat is needed is a pattern of dangerous conditions which were not attended to within a reasonable period of time"). Puhr points to testimony that it was PQ's "policy to not allow any unloading to take place unless the caustic unloading dike was free of standing water … and the [Univar] driver was wearing the appropriate PQ required PPE." Doc. 37 at 9 (alteration in original). But Puhr does not identify

anything in the record that would suggest that PQ employees violated this policy at any time other than on the day in question. In fact, Puhr concedes that Gary Edmon, who was usually responsible for handling sodium hydroxide deliveries, and Stanley Slusser, the plant manager, testified that they were aware of company policy to clean the unloading area of caustic liquids. *Ibid*. Edmon even testified that he would have cleaned out the unloading area prior to Puhr's delivery had he been on site that day. *Id*. at 9-10. Moreover, Puhr acknowledges that Skala testified that the area "usually has water in it and requires someone to go down and pump it out." *Id*. at 10.

Consequently, as in *Piotrowski*, there is no evidence here of any other incident, let alone a pattern of other incidents, of the type even remotely resembling the incident that injured Puhr. *See* 842 F.3d at 1040 (in holding that the defendant was entitled to summary judgment, explaining that there was "no evidence of any other incident involving rocks in the parking lot" or "any evidence of recurring escape of river rock from the planter onto the parking lot pavement or of any prior complaint of loose rock in the parking lot"). Likewise, in light of the evidence of PQ's consistent adherence to its cleanup policy, there is no evidence that spills of caustic liquids or other dangerous conditions were "not attended to within a reasonable period of time," and thus no evidence that PQ's policy of monitoring the unloading area and frequently cleaning it prior to subsequent deliveries was inadequate. *Ibid*. (emphasizing that the defendant had in place "policies and procedures [that] required Menard employees to monitor the parking lot and to be on the lookout for unsafe conditions"); *cf. Culli*, 862 F.2d at 126 (concluding that evidence of the timing and frequency of spills "made it unreasonable for the defendants to sweep the lot only at night and operate for most of the day with only one attendant who was primarily confined to the

cash register"). It follows that Puhr cannot prevail under the second method for demonstrating constructive notice.

The opinions of Puhr's retained expert—Dr. Edward Funk—do not lead to the opposite result. As to the first method of proving constructive notice, Dr. Funk does not opine that the record evidence sheds any light on how long the spill existed prior to Puhr's coming into contact with the sodium hydroxide that injured him. Doc. 34-11 at 12-13. As to the second method, although Dr. Funk opines that PQ employees on the day in question did not enforce PQ's rules regarding cleaning the unloading area before delivery and ensuring that delivery drivers wore chemical-resistant rubber boots, he does not opine that PQ's policies were unreasonable ones, nor does he suggest that the evidence shows a *pattern* of "system failure," as opposed to a one-off incident. *Ibid*.

The court acknowledges that Puhr advances a different version of the second method for proving constructive notice, one recently articulated in *Racky v. Belfor USA Grp.*, 83 N.E.3d 440 (Ill. App. 2017). Doc. 37 at 5. In *Racky*, the Appellate Court of Illinois held that when a negligence plaintiff "is relying on proof of constructive notice, he or she must establish either that the dangerous condition existed for a sufficient time," *id*. at 461—which mirrors the first constructive notice method set forth by the Seventh Circuit in *Piotrowski* and *Culli*—or that the dangerous condition "was so conspicuous that the defendant should have discovered the condition through the exercise of reasonable care," *ibid*.—which is different than the second method as understood by the Seventh Circuit, which focuses not on whether the dangerous condition was conspicuous, but rather on whether it was part of a pattern of conduct or a recurring incident.

This raises the question of what a district court must do when the Seventh Circuit's expressed understanding of Illinois law diverges from that of a state intermediate appellate court. In the absence of controlling authority from the Supreme Court of Illinois, the answer is that a district court must follow Seventh Circuit precedent. As the Seventh Circuit has held: "A decision by a state's supreme court terminates the authoritative force of our decisions interpreting state law, for under *Erie* our task in diversity litigation is to predict what the state's highest court will do. … But decisions of intermediate state courts lack similar force; … assuredly they do not themselves liberate district judges from the force of our decisions." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004); *see also Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) ("[W]hen a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue."); *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (same, citing *Wankier*). Accordingly, it would be inappropriate here for this court to apply *Racky*'s understanding of the second method of proving constructive notice.

**Conclusion**

For the foregoing reasons, PQ's summary judgment motion is granted. Judgment will be entered in favor of PQ and against Puhr.

January 3, 2018

United States District Judge